**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| APR SUPPLY CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Case No. 6:20-cv-00796 |
| | § | |
| V2 INCENTIVES, LP, VASTINE | § | |
| BROTHERS, LLC, SCOTT VASTINE | § | |
| AND TODD VASTINE, | § | |
| | | |
| Defendants. | | JURY TRIAL DEMANDED |

**PLAINTIFF APR SUPPLY CO.'S ORIGINAL COMPLAINT**

Plaintiff, APR SUPPLY CO., files this Original Complaint complaining of Defendants, V2 INCENTIVES, LP, VASTINE BROTHERS, LLC, SCOTT VASTINE and TODD VASTINE, and as claim for relief shows:

**PARTIES**

1.     Plaintiff, APR SUPPLY CO. ("APR Supply"), is a corporation organized under the laws of the state of Pennsylvania with its principal place of business located in the state of Pennsylvania and is a citizen of the state of Pennsylvania.

2.     Defendant V2 INCENTIVES, LP ("V2 Incentives") is a limited partnership organized under the laws of the state of Texas with its principal place of business located in the state of Texas and is a citizen of the state of Texas in that V2 Incentives' only general partner is Vastine Brothers, LLC, a limited liability company organized under the laws of the state of Texas whose principal place of business is located in the state of Texas and is citizen of the state of Texas and upon information and belief the limited partners of V2 Incentives are citizens of the state of Texas. V2 Incentives may be served with summons and a copy of Plaintiff's Original Complaint by serving its registered agent, Scott Vastine, at its registered office address of 117 Stonehurst Court, Aledo, Texas 76008.

1

3.      Defendant VASTINE BROTHERS, LLC ("Vastine Brothers") is a limited liability company organized under the laws of the state of Texas whose principal place of business is located in the state of Texas and is a citizen of the state of Texas in that the managers and directros of Vastine Brothers are Scott Vastine and Todd Vastine who are citizens of the state of Texas and upon information and belief are also the sole members of Vastine Brothers. Vastine Brothers may be served with summons and a copy of Plaintiff's Original Complaint by serving its registered agent, Scott Vastine, at its registered office address of 117 Stonehurst Court, Aledo, Texas 76008.

4.      Defendant SCOTT VASTINE is a natural person who is a citizen of the state of Texas and may be served with summons and a copy of Plaintiff's Original Complaint at his address of 1438 Valley Crest Court, Burleson, Texas 76028.

5.      Defendant TODD VASTINE is a natural person who is a citizen of the state of Texas and may be served with summons and a copy of Plaintiff's Original Complaint at his address of 1438 Valley Crest Court, Burleson, Texas 76028.

## **JURISDICTION**

6.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §1332 in that the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00 and a complete diversity of citizenship exists between APR Supply and the Defendants in this action. Specifically, APR Supply is a citizen of the state of Pennsylvania and the V2 Incentives limited partnership is a citizen of the state of Texas because its general partner, Vastine Brothers, is a citizen of the state of Texas and the managers and directors of Vastine Brothers, Scott Vastine and Todd Vastine are citizens of the state of Texas and, on information and belief, the limited partners of V2 Incentives are citizens of the state of Texas.

7.      This Court has personal jurisdiction over V2 Incentives and Vastine Brothers because (1) their principal place of business is in the state of Texas; (2) they transacts business

within the state of Texas; (3) they have continuous and systematic contacts with the state of Texas; and (4) they have purposefully availed themselves of the privileges and benefits of conducting business in the state of Texas. Specifically, V2 Incentives and Vastine Brothers engage in the business of selling travel services within the Western District of Texas and otherwise conduct business within the Western District of Texas. Thus, V2 Incentives and Vastine Brothers have substantial, systematic and sufficient contacts with the Western District of Texas such that being subjected to suit in the Western District of Texas will not offend traditional notions of fair play and substantial justice.

## VENUE

8.      V2 Incentives and Vastine Brothers are entities with the capacity to sue and be sued in their common names under Texas law and are subject to personal jurisdiction in the Western District of Texas with respect to this civil action are therefore deemed to reside in the Western District of Texas. Scott Vastine and Todd Vastine are residents of the state of Texas. Accordingly, venue of this civil action is properly placed in the Western District of Texas pursuant to 28 U.S.C. §1391(b)(1), (c)(2) and (d).

## AGENCY/RESPONDEAT SUPERIOR

9.      Whenever it is alleged in this Complaint that Defendants did any act, omission or thing, it is meant that Defendants' partners, managers, members, directors, officers, employees, servants, agents, apparent agents, ostensible agents, agents by estoppel and/or representatives did such act, omission or thing and that at the time such act, omission or thing was done it was done with the actual or implied knowledge of Defendants or was done with the full authorization or ratification of Defendants or was done in the normal and routine course and scope of agency or employment of Defendants' partners, managers, members, directors, officers, employees, servants,

3

agents, apparent agents, ostensible agents, agents by estoppel and/or representatives.

## FACTS

A.   **Defendants are Engaged to Plan and Organize APR Supply's 2020 Customer Incentive Trip to the Republic of Ireland**

10.    APR Supply is a wholesale supply business providing HVAC and plumbing products to customers in the state of Pennsylvania and surrounding states. As part of its commitment to building strong, long-lasting relationships with its customers, APR Supply from time to time organizes trips to support and show appreciation to the owners and employees of its loyal customers.

11.    In the summer of 2019, APR Supply began planning a customer appreciation trip to the Republic of Ireland. To help plan, organize and arrange this trip, APR Supply contacted Defendants who are in the business of providing marketing and incentive travel services to business customers. The services offered by Defendants included, but were not limited to, procuring hotel accommodations, making airline reservations, arranging ground transportation, producing food and beverage events, coordinating recreational activities, providing on-site program management services, overseeing décor and promotional collateral and handling administrative tasks such as participant registration and special requests.

12.    After discussing the goals and expectations for its 2020 customer appreciation trip with Defendants, APR Supply entered into a contract dated July 16, 2019 for the provision of travel-related services. *See* Exhibit A – Letter of Agreement ("Agreement"). The Agreement set forth the obligations and responsibilities of the parties regarding APR Supply's "2020 customer incentive trip to Wicklow, Ireland" (the "2020 Ireland Trip"). *See* Agreement at 1. The details for APR Supply's 2020 Ireland Trip included (but were not limited to) the following:

- Program Dates: June 21-27, 2020
- Destination: Wicklow, Ireland
- Flights: Round-trip flights to Dublin, Ireland
- Participants: 60
- Hotel: Powerscourt Hotel & Spa
- 5 nights in luxurious accommodations
- 4 suite upgrades
- Round-trip scheduled air to Dublin, Ireland
- Airport meet and greet with porter assistance
- Exclusive round-trip airport transfer with bottled water
- Private check-in with welcome drinks
- Welcome dinner with premium open bar, decor and musical entertainment
- Farewell dinner with premium open bar, decor and musical entertainment
- Dedicated V2 Program Manager and Program Coordinator
- V2 travel staff
- Creative copywriting, graphic design and printing of all program related collateral
- All taxes and gratuities for program inclusions
- Price Per Person: $4, 083.00 (including estimated air cost - $1,055.00)

13.     Defendants also agreed to provide a team of seasoned travel experts that included a Travel Program Manager, Program Coordinator, Air Specialist, Onsite Travel Staff, and Hospitality Desk. *See* Agreement at 5.

14.     The Agreement required APR Supply to pay an initial deposit of $100,000.00 on July 28, 2019, a second deposit of $72,490.00 on December 30, 2019 and an estimated final deposit of $72,490.00 on March 22, 2020. *See* Agreement at 7. In accordance with the Agreement, APR Supply timely paid the full amount of the initial deposit and the second deposit called for under the Agreement. However, prior to the arrival of the deadline for payment of the final deposit it became readily apparent that the scheduled 2020 Ireland Trip could not be undertaken due to the devastating effects of the world-wide COVID-19 pandemic. As such, as of the date of filing this action, APR Supply has paid Defendants approximately $184,490.00 for the 2020 Ireland Trip, inclusive of a $12,000 add-on at the request of APR Supply.

15.     The Agreement includes certain cancellation and attrition provisions along with a

Force Majeure clause. *See* Agreement at 5-6. The Force Majeure clause states:

> If either party is prevented from performing hereunder by reason of an act of God,
> insurrection, fire, explosion, strike, labor dispute, casualty, accident, flood, war,
> civil commotion, terrorism, or any law, order or decree of any government or
> subdivision thereof or cause beyond its reasonable control ("Force Majeure"),
> except for the payment of money, then this Agreement shall be suspended without
> penalty and all monies refunded immediately unless the trip can be relocated or
> rescheduled to Client's satisfaction. If this agreement is terminated under this
> paragraph, parties shall be excused from this agreement without penalty or liability
> of any kind to the other.

*See* Agreement at 6.

## B. Governmental Lockdowns and Decrees Due to the COVID-19 Pandemic Rendered APR Supply's Scheduled 2020 Ireland Trip Impossible

16.     In December 2019, media outlets started reporting that a new coronavirus had

emerged in China's Wuhan region. On January 20, 2020 the first case of COVID-19, the illness

resulting from the novel coronavirus, was identified in the United States. On January 30, 2020, the

first person-to-person transfer of COVID-19 virus in the United States was identified in Chicago,

Illinois. That same day, the United States government declared a public health emergency,

imposed a mandatory 14-day quarantine period for any United States citizens who had visited the

Hubei Province in China within the preceding two weeks, and began denying entry of non-U.S.

nationals who had traveled to China within the preceding two weeks. On February 29, 2020, the

first death from COVID-19 in the United States was reported in Kirkland, Washington.

17.     On March 11, 2020 the United States government announced a ban on travel from

Europe, excluding the United Kingdom and Ireland. Less than a week later, officials expanded the

ban to the United Kingdom and Ireland. *See* https://www.cnn.com/2020/03/14/politics/uk-ireland-

travel-restrictions-coronavirus/index.html. Similarly, on March 20, 2020, the United States'

borders with Mexico and Canada were closed to all non-essential travel. *See* https://www.usatoday.com/story/travel/news/2020/03/19/u-s-mexico-officials-look-ban-non-essential-travel-across-border/2874497001/. As of March 31, 2020, the United States State Department issued a global level 4 health advisory, advising United States citizens not to travel. This is the current status on the United States Department of State – Bureau of Consular Affairs website. *See* https://travel.state.gov/content/travel/en/traveladvisories/ea/travel-advisory-alert-global-level-4-health-advisory-issue.html.

18.     Similar restrictions have been imposed by governments around the world, including Ireland, and other countries in the European Union whose citizens were instructed that they should only leave home for strictly limited purposes and gatherings not to exceed groups of four people. Further, on or around March 24, 2020, Ireland went into lockdown and all non-essential retail outlets, including theatres, clubs, gyms casinos and restaurants and cafes not offering take-out options were closed. In addition, all Irish hotels were to limit occupancy to essential non-social and non-tourist reasons and all organized indoor or outdoor events in Ireland of any size were cancelled or ordered not to take place. *See* https://jrnl.ie/5055686.

19.     Critically, several material components of the 2020 Ireland Trip Defendants were planning for APR Supply were cancelled or postponed indefinitely. Airlines flights that Defendant was to arrange for the 2020 Ireland Trip participants were cancelled and quarantine measures for persons entering Ireland from the United States were put into place. In short, virtually all of the 2020 Ireland Trip participants limited or no ability to travel to Ireland.

20.     Even if APR Supply's 2020 Ireland Trip participants had been allowed entry into Ireland from the United States, they likely would not have any place to stay. During the scheduled dates for the 2020 Ireland Trip, Ireland was operating under Phase Two of its roadmap to ease

COVID-19 restrictions which, among many other things, called for pubs, hotels and other parts of the domestic tourism sector to remain closed until at least June 29, 2020. *See* https://jrnl.ie/5116215.

21.     The national and local governments in Ireland also prohibited tour buses from transporting passengers, meaning that even if the sixty or so participants for the 2020 Ireland Trip participants could fly to Ireland and participate in any planned indoor and outdoor social events and activities – which would be highly doubtful given the COVID-19 restrictions in place – they would not have pre-arranged ground transportation to and from the airport or to and from the location of the planned activities.

22.     Moreover, these same lockdown decrees from the Irish government would have drastically limited, if not completely prevented, the opportunity for trip participants to visit local tourist destinations, undertake unplanned side excursions or enjoy general community exploration. The hotel, golf course, shops, food gardens and distillery located on the Powerscourt Estate, the host property for the 2020 Ireland Trip, were all closed to anyone residing more than 20 miles from the estate's property. In fact, the Powerscourt Estate did not even begin to fully reopen until after the scheduled dates of the 2020 Ireland Trip had come and gone. The estate's shops, golf course, gardens, restaurants and other amenities did not open until June 29, 2020 and the Powerscourt Hotel where APR Supply's guests were to stay did not open until July 2, 2020. *See* http://www.powerscourt.com/blog/safetymeasures. Even today, Ireland remains under strict COVID-19 related limitations, including prohibiting gatherings of over fifty people. See https://www.euronews.com/2020/08/21/golfgate-irish-minister-and-senator-resign-after-attending-event-that-broke-covid-19-rules.

23.     In short, from the time period beginning in early 2020 with the world-wide onslaught of the COVID-19 pandemic through the scheduled dates for the 2020 Ireland Trip and even thereafter, there has been no reliable way to identify what businesses were open or closed in Ireland, when businesses that were closed would open, what restrictions would affect the ability of certain businesses to open and the limitations imposed on those businesses that were allowed to open. The multiple uncertainties as outlined above completely negated the fundamental purposes for which the 2020 Ireland Trip was conceived and planned and rendered APR Supply's scheduled 2020 Ireland Trip impossible; thus triggering its right to invoke the Force Majeure clause of the Agreement.

C.     **The Parties' Response to the Global COVID-19 Pandemic**

24.     As the COVID-19 pandemic began unfolding across the world, APR Supply became concerned that the scheduled 2020 Ireland Trip would be severely and adversely impacted as many of APR Supply's customers had expressed realistic concerns about undertaking any type of overseas travel. APR Supply reached out to Defendants on March 5, 2020 about these growing concerns and the likelihood that the 2020 Ireland Trip could not go forward as scheduled.  Despite APR Supply's requests that Defendants provide some information concerning whether and how the planned 2020 Ireland Trip could possibly occur while the COVID-19 pandemic was raging, Defendants provided no such information. Instead, during a telephone conference with Defendants on March 11, 2020 requested by APR Supply to consider the necessity of canceling the 2020 Ireland Trip in the face of the COVID-19 pandemic, Defendants vaguely and unrealistically suggested that the trip might still go forward despite all the information that was readily available at that time establishing that it could not possibly occur. After these discussions with Defendants concluded, APR Supply requested a full refund of the prior payments made to Defendants on

March 12, 2020 in accordance with provisions of the Agreement's Force Majeure clause. This request was triggered by the impossibility of going forward with the 2020 Ireland Trip as planned in light of existing and forecasted circumstances.

25.     Instead of honoring the Force Majeure clause, on March 18, 2020 Defendants attempted to convince APR Supply to reschedule the 2020 Ireland Trip for the month of September 2020. The next day Defendants were advised by APR Supply that rescheduling the 2020 Ireland Trip for September was unsatisfactory and would not work and demand was again made for a refund of the payments made to Defendants in accordance with the Agreement's Force Majeure clause. On March 19, 2020, Defendants informed APR Supply that Force Majeure did not apply and that it had only two options: (1) cancel the 2020 Ireland Trip and be subject to the full cancellation fee penalty, or (2) reschedule the trip for some unknown dates in the future whenever the COVID-19 pandemic had become less of a threat and the government lockdowns, quarantine procedures and social distancing restrictions had been lifted.

26.     On March 31, 2020 APR Supply reached out to Defendants to reiterate that a full refund of all advance payments made to Defendants was expected as provided by the parties' Agreement. Defendants responded by advising APR Supply that Defendants' suppliers were not returning deposits and that the likelihood of COVID-19 pandemic going into June and creating a case for Force Majeure was very low and that APR Supply's insistence that Defendants comply with Force Majeure provisions of the Agreement would only subject APR Supply cancellation penalties. In response to Defendants' intransigence, APR Supply requested Defendants to forward all vendors bills that Defendants had paid on APR Supply's behalf with the funds it had already sent to Defendants for the 2020 Ireland Trip. Defendants refused to comply with this request.

27.     Following up on its March 2020 requests, APR Supply sent correspondence to Defendants on April 7, 2020 specifically invoking the Force Majeure clause of the Agreement and demanding a full refund of all advance sums paid to Defendants for the 2020 Ireland Trip. On April 13, 2020, Defendants responded to APR Supply's April 7 correspondence. This exchange of correspondence was followed on April 28, 2020 by Defendants offering APR Supply the same two options as previously discussed: either reschedule the trip for a future date or cancel the trip and forfeit 100% of the payments previously paid to Defendants as a penalty. Defendants were advised that neither of these options were acceptable to APR Supply nor were they mandated by the terms of the parties' Agreement once the Force Majeure clause had been invoked.

28.     Upon being apprised of APR Supply's response, Defendants then offered to contact its suppliers to determine what types of credit would be available to APR Supply if the 2020 Ireland Trip was cancelled. APR Supply indicated its willingness to consider this information in working towards a resolution if Defendants provided transparency with regard to the amount of APR Supply's funds that were paid to each relevant suppliers and what portions of those funds the suppliers were willing to refund or return. However, Defendants would not provide APR Supply with key financial information concerning how and where Defendants had spent or used the $184,490.00 sum that APR Supply had already paid Defendants. Nor would Defendants disclose to APR Supply how those funds might be transferred over to a new trip in a financially secure manner or what potential trip rescheduling refunds or monetary transfers might be necessary to facilitate a new trip. In the meantime, APR Supply independently determined that Powerscourt Hotel where the 2020 Ireland Trip was to be hosted would continue to remain closed through July 20, 2020 – clearly proving that the scheduled trip had been impossible since March.

11

29.     On June 23, 2020, presumably after finally facing up to the fact that the 2020 Ireland Trip had been impossible and that Defendants were not going to be able to offer an alternative trip that was satisfactory to APR Supply, Defendants speciously claimed that APR Supply had improperly cancelled the Agreement and – incredibly – accused APR Supply of breaching the agreement by not making the final deposit payment. This allegation was leveled at APR Supply notwithstanding its demonstrated willingness to allow Defendants to keep some portion of the funds paid to them as compensation for securing refunds or returns from their suppliers of the APR Supply funds paid to them by Defendants.

30.     In truth, APR Supply had not breached or otherwise repudiated the Agreement. Instead, APR Supply had attempted to work in good faith with Defendants since early March to identify alternative options concerning the 2020 Ireland Trip and to discuss rescheduling the trip to APR Supply's satisfaction. During those discussions, Defendants attempted to assuage APR Supply's multiple concerns by pointing APR Supply to the Agreement's Force Majeure clause as mechanism for making APR Supply whole if the 2020 Ireland Trip proved to be an impossibility and then could not be satisfactorily rescheduled.

31.     In attempting to determine the viability of an alternative trip and how the funds APR Supply had already paid to Defendants could be applied towards such a trip, APR Supply requested information from Defendants regarding how its previously deposited funds had been spent or used. However, Defendants suspiciously refused to provide that information and directed APR Supply not to obtain the requested information directly from the vendors. This behavior led APR Supply to reasonably conclude that Defendants had not preserved APR Supply's deposited funds nor spent those funds exclusively for APR Supply's benefit or for purposes of the 2020 Ireland Trip that APR Supply had paid Defendants to plan.

12

32.      The Agreement's Force Majeure clause plainly called for a full refund to APR Supply of all funds paid to Defendants as soon as it became evident that the planned 2020 Ireland Trip could not possibly occur. Events occurring subsequent to the invocation of Force Majeure by APR Supply have only served to reinforce the propriety of that exercise of APR Supply's contractual rights under the parties' Agreement. In recognition of these circumstances and in accordance with the terms of the Agreement, APR Supply has properly demanded a full refund of the monies it has paid to Defendants. Yet Defendants have refused to provide that refund to APR Supply in violation of the provisions of the Force Majeure clause and in clear breach of the Agreement. And while APR Supply was at one time willing to consider any viable, financially-secured, and otherwise satisfactory alternative trips that Defendants could offer, Defendants have consistently refused to provide any transparency to APR Supply or to work with it in good faith, beginning with Defendants' adamant refusal to reveal to APR Supply how, when and where its $184,490.00 payment had been spent or used.

**CLAIMS FOR RELIEF**

**Count 1 - Breach of Contract**

33.      APR Supply re-alleges all prior paragraphs of this Complaint and says that the subject Agreement is a valid and enforceable contract entered into by APR Supply and Defendants and was in full force and effect at all material times.  APR Supply has timely and fully performed all of its contractual obligations and duties under the Agreement or has otherwise tendered performance of all its obligations and duties under the Agreement or has been excused from performing its contractual and duties under the Agreement.  Specifically, APR Supply provided payments to Defendants, as dictated by the Deposit Amount Schedule laid out in the Agreement, until it became clear that undertaking the 2020 Ireland Trip was impossible.

34.    However, Defendants have materially breached the Agreement by failing to refund and still refusing to refund APR Supply the amounts rightly due and owing to APR Supply by virtue of the operation of the Force Majeure contained in the Agreement. This is despite the fact that APR Supply has complied or substantially complied with all conditions and covenants imposed on APR Supply by the terms of the Agreement. Specifically, the Force Majeure clause of the Agreement called upon Defendants to fully and immediately refund all monies paid to them by APR Supply if either party was prevented from performing under the Agreement by, among other things, an act of God or any law, order or decree of any government or subdivision thereof or other cause beyond the control a party's reasonable control. That is exactly what happened when the COVID-19 pandemic operated to prevent the 2020 Ireland Trip from occurring as planned.

35.    Moreover, the 2020 Ireland Trip cannot be "relocated or reschedule to *Client's satisfaction*" as specified in the Force Majeure clause of the Agreement, despite APR Supply's willingness to work with Defendants in that regard. *See* Agreement at 7 (emphasis added). Among other things, Defendants refusal to provide the financial information necessary to satisfactorily prove to APR Supply that any rescheduled trip was guaranteed by the money APR Supply has already paid to Defendants was of great concern to APR Supply. To force APR Supply to reschedule or relocate a trip of this magnitude, complexity and expense, without providing this key information needed to assure APR Supply that its deposit money was secure, and that any new trip would be adequately protected is a completely unacceptable solution. In short, Defendants have proven themselves to be evasive at best and untrustworthy at worst and generally incapable of providing APR Supply with a satisfactory alternative trip.

36.    As such, the Force Majeure clause applies and all monies paid to Defendants should be refunded to APR Supply immediately. Because Defendants refuse to do so and have refused to

provide (or are incapable of providing) an alternative trip that is satisfactory to APR Supply, Defendants have clearly and materially breached the Agreement.

37.     APR Supply has made prior formal written demands upon Defendants to perform their obligations under the Agreement, but Defendants have wholly failed and refused and still wholly fail and refuse to perform their contractual obligations to APR Supply.  Defendants' refusal to refund APR Supply the amounts due and owing under the Agreement and Defendants' refusal to otherwise perform their duties and obligations under the terms of the subject contract amounts to a material breach of the Agreement by Defendants.

38.     As a natural, probable and foreseeable consequence of Defendants' breach of the Agreement, APR Supply has been caused to suffer actual damages in at least the sum of $184,490.00.

### Count 2 - Negligent Misrepresentation

39.     Pleading additionally or in the alternative, APR Supply re-alleges all prior paragraphs of this Complaint and says that Defendants made material representations to APR Supply in the course of business or in a transaction in which Defendants had a pecuniary interest, namely that Defendants would fully and immediately refund all monies paid to them by APR Supply if the 2020 Ireland Trip could not be held as planned or if an alternative trip that was satisfactory to APR Supply could not be scheduled.  These representations that were supplied to APR Supply by Defendants consisted of false information for the guidance of others. Defendants did not exercise reasonable care or competence in obtaining or communicating this information to APR Supply and APR Supply justifiably relied on this information.

40.     These negligent misrepresentations made to APR Supply by Defendants were a proximate cause of actual damages to APR Supply as hereinafter described.

## ACTUAL DAMAGES

41.     APR Supply re-alleges all prior paragraphs of this Complaint and says that because of the conduct described above, APR Supply has suffered and will continue to suffer actual damages caused by, among other things, Defendants' failure to fully and immediately refund all monies that APR Supply has paid to them which, at the present time, is in the estimated total amount of at least $184,490.00. APR Supply's actual damages are subject to increase upon further discovery undertaken in this action or by the addition of future losses suffered by APR Supply as a result of Defendants' course of conduct as described herein.

## ATTORNEY'S FEES

42.     APR Supply re-alleges all prior paragraphs of this Complaint and says that pursuant to Tex. Civ. Prac. & Rem. C. §38.001 *et. seq.*, APR Supply seeks an award of reasonable and necessary attorney's fees from Defendants, in connection with the investigation, filing, preparation and trial of this action through the date a notice of appeal is filed by any party to this action.  APR Supply further seeks a conditional award of reasonable and necessary attorney's fees in the event of an appeal of this action to the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court or, in the alternative, APR Supply asks the Court to retain jurisdiction of this action for the limited purpose of awarding reasonable and necessary appellate attorney's fees at the conclusion of all appellate proceedings should the appellate courts decline to do so.

## CONDITIONS PRECEDENT

43.     APR Supply re-alleges all prior paragraphs of this Complaint and says that all covenants or conditions precedent to recovery on APR Supply's claims for relief and to Defendants' liability therefore have been performed or have now occurred.  Alternatively, APR Supply alleges that the non-performance of any covenants or condition precedent to Defendants'

liability to APR Supply have been waived by Defendants or otherwise legally excused or have not caused Defendants to suffer any actual prejudice.

## CONCLUSION

44.     Because of all the above and foregoing, APR Supply has been damaged in a sum exceeding the jurisdictional limits of this Court.

## DEMAND FOR JURY TRIAL

45.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure APR Supply demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

PREMISES CONSIDERED, Plaintiff APR SUPPLY CO. prays that Defendants V2 INCENTIVES, LP, VASTINE BROTHERS, LLC, SCOTT VASTINE and TODD VASTINE, be summoned to appear and answer herein as required by law and that upon final hearing or trial of this action, Plaintiff recover of and from Defendants, the following relief:

a.      Actual damages in such sums as Plaintiff may be shown to be reasonably entitled to recover under the law and evidence introduced at the time of trial;

b.      Reasonable and necessary attorney's fees, with conditional sums for the services of Plaintiff's attorneys in the event of subsequent appeals;

c.      Prejudgment interest on all damages from date of accrual until date of judgment at the highest rate of interest allowed by law on all damages;

d.      Post-judgment interest on all damages from date of judgment until paid at the highest rate of interest allowed by law;

e.      Cost of court; and

f.      Such other and further relief as the Court determines is proper, both general and special, either at law or in equity, to which Plaintiff may be justly entitled.

Dated: August 28, 2020

Respectfully submitted,

Andy Tindel (Lead Attorney)
Texas State Bar No. 20054500

MT2 LAW GROUP
MANN | TINDEL | THOMPSON
112 East Line Street, Suite 304
Tyler, Texas 75702
913 Franklin Avenue, Suite 201
Waco, Texas 76701
Tel: (903) 596-0900
Fax: (903) 596-0909
Email: atindel@andytindel.com

**ATTORNEYS FOR PLAINTIFF**